Filed 7/29/15  P. v. Fredrick CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067448 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. E058934) |
| VERNON FREDRICK et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Riverside County, Kelly L. Hansen, Judge.  Affirmed in part and reversed in part.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant Vernon Fredrick.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant DeAnthony Jeff Brooks.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Antwine Keon Stafford.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants Vernon Fredrick, Antwine Stafford and DeAnthony Brooks of numerous crimes arising from a robbery and subsequent home invasion, and found true the allegations that Stafford and Fredrick personally used a firearm in connection with some of the crimes within the meaning of Penal Code[1] sections 12022.53, subdivision (b), and section 1192.7, subdivision (c)(8); that each defendant personally inflicted great bodily injury on a victim in connection with one of the crimes (§§ 12022.7, subd. (a)(1) & 1192.7, subd. (c)(8)); and that each defendant committed each of the offenses for the benefit of, at the direction of, or in association with, a criminal street gang within the meaning section 186.22, subdivision (b) (the section 186.22, subdivision (b), enhancement).[2] Stafford was sentenced to an aggregated

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

[2]     The jury found defendants guilty of (1) conspiracy to commit torture, robbery, extortion and assault with a firearm (§ 182, subd. (a)(1)), count 1), and found true the section 186.22, subdivision (b), enhancement appended to count one; (2) torturing Frank S. (§ 206, count 2) and found true the section 186.22, subdivision (b), enhancement appended to count two and found true that Stafford and Fredrick each personally used a firearm in connection with count two; (3) acting in concert to rob Frank S. in an inhabited dwelling (§§ 211/213, subd. (a)(1)(A), and found true the section 186.22, subdivision (b), enhancement appended to count three as to all defendants and that Brooks acted as a principal for the benefit of a street gang within the meaning of section 12022.53, subdivision (e), in connection with count three, and that each defendant personally inflicted great bodily harm on Frank S. in connection with count three, and that Stafford and Fredrick each personally used a firearm in connection with count three; (4) assault with a firearm on Frank S. (§ 245, subd. (a)(2), count 4), and found true the section

2

indeterminate term of 43 years to life plus a determinate term of nine years. Brooks was sentenced to an indeterminate term of 15 years to life plus a determinate term of 10 years 4 months. Fredrick, who made a last minute motion to represent himself at sentencing but withdrew that request when the court stated it would not grant him any further continuances of the sentencing hearing, was sentenced to an aggregate indeterminate term of 43 years to life plus a determinate term of nine years. Defendants raise numerous challenges to the judgments and sentences that we examine seriatim after reviewing the factual basis for the convictions and sentences.

I

FACTS

A. The Evidence Concerning the Underlying Offenses

Frank S., the victim of many of the offenses, met Ms. Wilson in June 2010 and they had a dating relationship for a few months. About a week before the crimes, Frank took Wilson to a family reunion during which he told her he would be receiving an inheritance of approximately $22,000.

---

186.22, subdivision (b), enhancement appended to count four as to all defendants in connection with count four and that Fredrick personally used a firearm in connection with count four; (5) committed a residential burglary of Shontae P.'s home (§ 459, count six) and found true the section 186.22, subdivision (b), enhancement appended to count six as to all defendants; (6) attempted robbery of Shontae P. (§§ 664/211, count seven) and found true the section 186.22, subdivision (b), enhancement appended to count seven as to all defendants; and (7) that defendants actively participated in a criminal street gang (§ 186.22, subd. (a), count eight). Stafford was also charged with two "prison priors" (§ 667.5, subd. (b)), which were bifurcated; at sentencing and pursuant to an agreement between the parties, Stafford admitted one of the prison priors and the prosecution dismissed the other.

3

On August 15, 2010, Frank received a voice-mail message from Wilson in which she asked to borrow some money from him. Later that night, around 10:00 p.m., Frank was at the apartment of Shontae P. when he received a phone call from Wilson, and Frank assured Wilson he would be coming to her apartment that evening. After Frank left Shontae's apartment, he made a stop and received another call from Wilson in which she asked him how long it was going to take him to arrive, which struck Frank as odd.

Frank drove to Wilson's apartment and let himself in with a key she had given him. As he opened the door and entered Wilson's apartment, he saw her sitting on the couch wearing street clothing, which was unusual because she was usually dressed in pajamas when he visited her. When Frank turned back to close the door behind him, Fredrick hit Frank on the back of the head with a gun. Stafford and Brooks entered the room from a hallway, and Stafford pointed a gun at Frank and told Frank he was being robbed.

Frank was on his knees bleeding from Fredrick's blow. Stafford told Frank to lie down and, when Frank resisted, Stafford struck him in the face with a gun. Stafford and Fredrick restrained Frank while Brooks used duct tape to bind Frank's hands and feet. Fredrick said, "Blood, he don't have no . . . money. Look at his shoes. She's lying to us." Frank had only about $20 in his possession and was wearing a beat-up pair of shoes he used when mowing the lawn. All of the defendants, as well as Wilson, employed the term "Blood" numerous times during the ordeal.

Frank told the men he didn't have any money but, if they took him to an ATM, he could get money for them. Stafford said Frank was too loud and Brooks put duct tape

4

over Frank's mouth. Stafford yelled "Get the spoons and forks," and Brooks went to the kitchen where he, aided by Wilson, heated a fork and spoon. Stafford pressed a hot spoon on Frank's forearm, and Fredrick demanded that Frank tell them where he hid his cash.[3] The men kept asking where Frank's money was, with Stafford saying "my bitch is not going to lie to me. We ain't out here for nothing."[4] Fredrick also went through Frank's pockets and removed his wallet, cell phone, keys, and money.

After finding Frank's keys, Stafford asked Wilson "you know where he stay at?" and she replied "yeah."[5] Wilson asked if the keys in Frank's pockets were to "Shontae's house," and after Frank replied that they were, Fredrick and Wilson left Wilson's apartment to retrieve Frank's bag. While Fredrick and Wilson were gone, Stafford and Brooks continued talking to Frank. Brooks told Frank that he was just there for the money, and Stafford said "It's not personal. It's just business." Also while Fredrick and Wilson were gone, Stafford saw a bottle of tequila on the counter and asked Frank if it

---

[3]    Brooks also used a hot fork on one of Frank's forearms.

[4]    Stafford's reference to "my bitch" was in apparent reference to Wilson. Stafford told Frank, in reference to Wilson, that Wilson was "my childhood . . . [¶] . . . [¶] . . . bitch. [¶] . . . [¶] I took her virginity." "[M]y name [is] tattooed all over her body." Wilson, testifying in her own defense, testified she and Stafford became sexual partners when she was around 16 or 17 After a hiatus in their relationship, she resumed her relationship with Stafford and, at his request, got tattoos of "Antwine" (Stafford's first name) and "Miss Pig" (a reference to Stafford's moniker, "Pig").

[5]    Wilson testified Frank told defendants he had money in a red bag at Shontae P.'s house.

was his, and he said it was. Stafford grabbed the bottle and drank from it, but he became sick and vomited. Stafford's fingerprints were found on the bottle.

Around midnight, Fredrick and Wilson entered Shontae's apartment using Frank's key.[6] Shontae awoke to find Wilson ransacking her bedroom closet while Fredrick was in the kitchen. Fredrick confronted Shontae and demanded, "Where's the bag?" Shontae refused to cooperate until she had spoken to Frank, so Wilson placed a call and Shontae spoke to Frank, who told Shontae to give them whatever they wanted. Shontae grabbed a book bag and threw it at Wilson. She also picked up a knife, pointed it at Fredrick and Wilson, and told them to get out. Fredrick and Wilson then left Shontae's apartment and returned to Wilson's apartment.

On returning to Wilson's apartment, Fredrick told Stafford, "Hey, it's over. Why you guys didn't tell me he lives by Depot Deli? The police hang out up there all the time." Frank thought he was going die because the men did not have masks on, and they discussed killing him and dumping his body. However, they concluded there would be too much blood if they killed Frank in Wilson's apartment.

They decided to let Frank go. They removed the duct tape and cleaned up the blood on Frank, cut off his bloodied shirt and gave him an unbloodied coat he had left in Wilson's car, and let him go with a warning that he not call the police. As Frank ran

---

6    Frank had an intimate relationship with Shontae, provided childcare for Shontae's son, and had a key to her apartment.

away, he saw Wilson and Stafford get into Wilson's truck and saw Fredrick and Brooks get into a white Buick.

Frank ran to Shontae's apartment and, when he arrived, there was a crowd outside, including Shontae and her son. Shontae drove him to the emergency room and, at first, he told the nurse he had fallen. However, he eventually admitted he had been assaulted, and the nurse called 911. Frank suffered significant injuries from the attack.

B. The Evidence Concerning Defendants' Gang Status[7]

The prosecution theory was that defendants were members of "Bounty Hunter Bloods" (BHB), a criminal street gang whose main territory included a housing project known as Nickerson Gardens. During the attack, defendants referred to each other as "Blood" and did not use each other's names. However, during the attack, defendants did not mention their affiliation with BHB, did not wear gang colors or display tattoos associated with BHB, and the crimes were committed outside the traditional boundaries of BHB territory.

Detective Moreno, an expert specializing in gang-related activities, testified BHB was an ongoing criminal enterprise that had as its primary activities robbery, drug sales, weapons violations, murder and witness intimidation. The expert stated Stafford was a member of BHB in August 2010 based, in part, on his admission to Detective Moreno that Stafford was a member of BHB. The expert similarly stated, based on information

---

[7] We more fully discuss the gang evidence in connection with our analysis of defendants' complaints of evidentiary error as to the gang evidence.

provided to the expert, that both Fredrick and Brooks were also BHB members in August 2010.

II

THE *WHEELER*[8]/*BATSON*[9] CLAIM

Fredrick, Brooks and Stafford challenge all of the convictions because they contend the trial court erred when it concluded the prosecution had not employed its peremptory challenges to certain jurors in violation of defendants' rights under the California and United States Constitutions, and the court did not conduct an "adequate" inquiry after the prosecution stated its reasons for exercising the peremptory challenges.

A. Applicable Law

Defendants contend the prosecution violated their state and federal constitutional rights by exercising its peremptory challenge to excuse a prospective juror because she was African-American. In *People v. Wheeler, supra,* 22 Cal.3d 258, our Supreme Court held "the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article 1, section 16 of the California Constitution. Subsequently, in [*Batson v. Kentucky, supra,* 476 U.S. 79] . . . , the United States Supreme Court held that such a practice violates . . . the defendant's right to equal protection of the laws under the Fourteenth Amendment to the

---

8    *People v. Wheeler* (1978) 22 Cal.3d 258.

9    *Batson v. Kentucky* (1986) 476 U.S. 79.

United States Constitution.  African-Americans are a cognizable group for purposes of both *Wheeler* [citation] and *Batson* [citation]."  (*People v. Alvarez* (1996) 14 Cal.4th 155, 192-193.)

"The law applicable to *Wheeler/Batson* claims is now familiar.  'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' "  (*People v. Mills* (2010) 48 Cal.4th 158, 173.)

"The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]."  (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613.)  "On appeal, we review the trial court's determination deferentially, 'examining only whether substantial evidence supports its conclusions.  [Citation.]'  [Quoting *Lenix*, *supra*, at p. 613.]  'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]'  [Quoting *People v. Burgener* (2003) 29 Cal.4th 833, 864.]"  (*People v. Manibusan* (2013) 58 Cal.4th 40, 76.)

9

B. <u>Factual Context</u>

The prosecution exercised a peremptory challenge to excuse prospective juror D.L. When the prosecution subsequently exercised its ninth peremptory challenge to excuse prospective juror L.W., the defense noted this was the second African-American female dismissed by peremptory challenge and made a *Wheeler* motion. The court found the defense satisfied its burden of making a prima facie case that the relevant facts could give rise to an inference of improper use of the prosecution's peremptory challenges, and therefore moved to the second stage by requiring the prosecution to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.

The prosecution, discussing its reasons for excusing prospective juror D.L., noted she worked for Riverside County probation and one of the prosecution's witnesses was a Riverside County probation officer. The prosecution said one reason for peremptorily challenging D.L. was it did not "want to make it look like [it] was stacking the jury" but then went on to explain that the "*main* reason [was] because--it's for the same reason that I would have kicked the lawyer in a panel, same reason I would kick a retired police officer in a panel is that I think when certain individuals are in the same profession, as . . . a probation officer[] in this case, they can be overly critical of that witness and hold things against that witness if they act or behave or made a mistake in the course of their investigation." (Italics added.) The prosecution related a prior experience in which it had left a retired police officer on the jury and, when interviewing that jury after it returned a not guilty verdict, learned the police officer "was very critical of the investigation and was actually the ring leader in holding that . . . against our case, and so that was my

10

reason[] for kicking [D.L.]." It then went on to explain the reasons for excusing

prospective juror L.W., which included that she was a nurse and she also had a husband,

brother and cousin enmeshed with legal troubles. The court, noting the prosecution had

provided race-neutral reasons for its peremptory challenges, invited the defense to

provide evidence or argument to convince the court those explanations were pretextual.

The defense argued, as to D.L., that the court should find the prosecution's reasons

were not sincere because the prosecution's probation officer witness was going to be a

"minor character in this case" and held a job different from the job occupied by

prospective juror D.L. The court found that, "at least up to this point[,] the [prosecution

has] exercised peremptory challenges in a race neutral fashion" and denied the *Wheeler*

motion.

C. Analysis

Under the applicable standards of review, defendants' claim of error is not

persuasive. The prosecution articulated two race neutral reasons for excusing juror D.L.:

it was concerned she might be overly critical of a prosecution witness's testimony, and it

wanted to avoid the appearance of "stacking" the jury. Defendants do not assert these are

not race-neutral reasons, but instead assert these reasons must be deemed pretextual

because (1) D.L. assured the prosecution she would not "hold it against [the prosecution

witness]" if his actions were "not at all what I would have done if I was in that position,"

and (2) no reasonable prosecution would not want to "stack" the jury in its favor.

However, those claims merely attack the genuineness of the prosecution's proffered

11

reasons, and were argued below to the trial court, which rejected those arguments and impliedly found the reasons to be credible.

When a reviewing court is asked to determine whether the trial court's ultimate acceptance of the prosecution's justifications can be sustained, we are cautioned that a reviewing court:

> "review[s] such a determination with great restraint. The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race- or group-neutral explanation related to the particular case being tried. [Citations.] The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. [Citations.] [¶] 'If the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount " 'the variety of [subjective] factors and considerations,' " including "prospective jurors' body language or manner of answering questions," which legitimately inform a trial lawyer's decision to exercise peremptory challenges. [Citations.]' [Quoting *People v. Montiel* (1993) 5 Cal.4th 877, 909.]" (*People v. Arias* (1996) 13 Cal.4th 92, 136.)

The record below satisfies us that the trial court did conduct a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered[10]: it solicited the

_____

[10]    Defendants appear separately to argue the court did not conduct an "adequate" inquiry because the court merely "accepted at face value" the reasons proffered by the prosecution. Certainly, when a prosecution proffers reasons that are either contradicted by the record or "so lacking in content as to amount to virtually no explanation" (*People v. Turner* (1986) 42 Cal.3d 711, 725, 722-725), a court that simply accepts them and overrules the objection without any further argument or inquiry has not adequately fulfilled its obligations to make a sincere and reasoned effort to evaluate their genuineness and sufficiency in light of all the circumstances of the trial. (*Id*. at pp. 725-727.) However, the court here did inquire, listen to argument, and engaged in an

prosecution's reasons; it solicited the defense arguments on whether the reasons were pretextual; it asked the defense (in addressing the defense's arguments that the prosecution's explanation for challenging prospective juror L.W. was pretextual) whether it could point to another juror similarly situated to L.W. who had not been excused by the prosecution and engaged in an extended colloquy over those issues; and it invited the defense to provide the court with evidence showing the proffered explanations were pretextual. Because the trial court " '[made] a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*People v. Arias, supra,* 13 Cal.4th at p. 136.) The court impliedly found the articulated race-neutral reasons to be credible. At this stage of the *Wheeler/Batson* inquiry, " 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*People v. Lenix, supra*, 44 Cal.4th at p. 613, fn. omitted.) We conclude substantial evidence

evaluation of the bona fides of the explanations proffered by the prosecution. Accordingly, we are not persuaded by defendants' claim that the third step in the *Wheeler/Batson* inquiry was inadequate.

supports the conclusion the prosecution's proffered reasons for excusing the challenged prospective jurors were not pretextual, and therefore we will not interfere with the trial court's ruling denying the *Wheeler*/*Batson* motion.

## III

## THE GANG EVIDENCE CONVICTIONS AND ENHANCEMENTS CLAIMS

Defendants raise myriad challenges to the convictions on count eight for active participation in a criminal street gang (the section 186.22, subdivision (a), offense), and to the true findings on the section 186.22, subdivision (b), enhancements appended to numerous other counts. They contend (1) the evidence was insufficient to support a finding BHB was a "criminal street gang," a necessary element of both the section 186.22, subdivision (a), offense and the section 186.22, subdivision (b), enhancement; (2) it was error to allow the expert to testify about inadmissible hearsay on which he relied to form the basis for his opinions as to BHB and defendants' participation in BHB, and the error denied defendants their right to confront witnesses; and (3) the court erred when it instructed the jury to determine the truth of the hearsay relied on by the expert. Defendants also contend the court erred when it denied the motion to bifurcate trial of the gang allegations from the remaining counts, and committed instructional error by misinstructing the jury as to the requirement that at least two gang members be involved in the requisite felonious activity before the jury can convict them of the section 186.22, subdivision (a), offense.

A. The Relevant Facts

Detective Moreno was an expert specializing in gang-related activities.[11]  Before he joined the gang impact team, Moreno had been assigned to a beat that included Nickerson Gardens, a housing project in BHB's main territory. Over the years, Moreno had investigated hundreds of crimes allegedly committed by BHB members.

Moreno testified BHB was an ongoing criminal enterprise that had, as its primary activities, robberies, drug sales, weapons violations, murder and witness intimidation. Court records introduced at trial showed a Mr. Fair was convicted of attempted murder in 2010, and that the jury had found Fair had committed the murder for the benefit of, at the direction of, and in association with the BHB gang.  Court records introduced at trial showed a Mr. Watts was convicted of robbery in 2009, and that the jury had found Watts had committed the robbery for the benefit of, at the direction of, and in association with the BHB gang.  Moreno testified Fair and Watts were BHB members.

Moreno had known Stafford since Stafford was a teenager.  Moreno testified Stafford was a member of BHB in August 2010 based, in part, on his admission to Moreno that he was a member of BHB, as well as other factors.[12]  Stafford's gang moniker is "Pig."  Moreno was also familiar with Fredrick.  Moreno testified Fredrick

[11]     Extensive evidentiary groundwork qualifying Moreno as a gang expert was provided at trial, and defendants do not on appeal claim the evidence was inadequate to establish Moreno's qualifications as an expert on the BHB gang.

[12]     The other factors relied on by Moreno included that he had numerous contacts with Stafford over the years, Stafford was with other BHB members over half the time, and Stafford had BHB tattoos.

was a member of BHB in August 2010 based, in part, on Fredrick's admission to two of Detective Moreno's former partners that Fredrick was a member of BHB,[13] as well as the fact that Fredrick displays a BHB tattoo and associates with other BHB members. Additionally, Fredrick's deceased half brother was a high ranking member of BHB, and a path to gang membership can include familial relationships. Moreno was also familiar with Brooks. Moreno testified Brooks was a member of BHB in August 2010 based, in part, on Brooks's admission to numerous officers that he was a member of BHB, as well as the fact that his father and uncle were known to Moreno to be BHB members and Brooks's family associated with other BHB members.

Moreno was asked a hypothetical question based on an assumed set of facts paralleling the facts of the present case. The assumed facts were that an established BHB member of over 10 years, along with two other BHB members, go to a residence in Hemet occupied by an associate and have that associate call an acquaintance to ask the acquaintance to lend money to the associate. When the acquaintance arrives at the

---

[13]    The record is unclear whether Moreno personally heard Fredrick admit his membership in BHB. During direct testimony, Moreno testified Fredrick admitted membership in BHB "to Officer Coughlin, [who] used to be my partner," suggesting Moreno may not have been present during Fredrick's admission. However, during redirect, Moreno testified that (at the time of Fredrick's preliminary hearing) Moreno stated he did not recall contacting Fredrick in the Nickerson Gardens area, but "that was in error." Moreno testified at trial that (subsequent to the preliminary hearing) he refreshed his memory because "Officer [Coughlin] and myself started going back through old reports, and I found the report where I was involved in [Fredrick's] arrest. And I talked to the partner I worked with that day, and he refreshed my memory on the case." This testimony implies Moreno was *with* Officer Coughlin when Fredrick admitted BHB membership to Coughlin and therefore may have heard Fredrick's admission of BHB membership.

associate's residence, the BHB members assault him with firearms, rob and burn him with heated utensils, telling the victim, "It's not personal. It's just business." The established BHB member then instructs one of the participating BHB members to go (along with the associate) to another residence to attempt to steal money. The expert testified, based on that set of assumed facts, the crimes were committed for the benefit of the BHB gang (because the proceeds went into the control of BHB members and the level of violence would intimidate the victim from aiding any prosecution of the BHB members), at the direction of the BHB gang (because a ranking member was directing the crimes), and in association with the BHB gang (because multiple members participated). The fact the assailants referred to each other as "Blood" throughout the attack reinforced Moreno's opinion because it both demonstrated intra-gang respect and left fewer clues from which authorities could track or identify the perpetrators.

B. The Statutory Framework

The California Street Terrorism Enforcement and Prevention Act (the STEP Act) (§ 186.20 et seq.) creates both a substantive offense (the § 186.22, subd. (a) offense) and an enhancement to other crimes (the § 186.22, subd. (b) enhancement). The substantive offense punishes "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . ." (§ 186.22, subd. (a).) The elements of the substantive offense are "[f]irst, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's

17

members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).)

The STEP Act also created a sentencing enhancement, the section 186.22, subdivision (b), enhancement, which "imposes additional penalties for 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. . . .' Unlike the substantive offense, the enhancement does not require proof of participation in a gang. It is further distinguished from the substantive offense by applying only to gang-related offenses and by requiring the defendant to act with the *specific intent* to promote, further, or assist any criminal conduct by gang members." (*People v. Rodriguez, supra,* 55 Cal.4th at p. 1130, fn. 5.)

The STEP Act defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, *having as one of its primary activities the commission of one or more of* [*certain enumerated*] *criminal acts* . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.)

C. <u>The Substantial Evidence Claim</u>

Defendants first assert the evidence was insufficient to support a finding BHB was a "criminal street gang," a necessary element of both the section 186.22, subdivision (a), offense and the section 186.22, subdivision (b), enhancement. An essential element of

18

proof that a particular gang comes within the definition of the STEP law is evidence that one of the alleged criminal street gang's primary activities is the commission of one or more of certain crimes listed in the gang statute. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 322.)

Moreno testified the "primary activities" of BHB included attempted murders and robberies, and cited two specific convictions for an attempted murder by one BHB member and a robbery by another BHB member to buttress that opinion. In *People v. Duran* (2002) 97 Cal.App.4th 1448, the defendant argued similar testimony by an expert was insufficient on the "primary activity" element. Rejecting that argument, the *Duran* court stated:

> "We conclude the evidence was sufficient to support the jury's finding that the [gang's] primary activities were statutorily enumerated criminal offenses. Robbery, assault with a deadly weapon, and narcotics sales are all enumerated offenses. [Citation.] As explained *ante*, Burciaga testified as an expert, based in part upon his personal experience in the field gathering gang intelligence, contacting gang members, and investigating gang-related crimes. The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.] . . . [¶] . . . Burciaga testified that the [gang] members engaged in these activities 'often' [and] [e]vidence of the Beckum robbery and the Aldaco conviction further corroborated Burciaga's testimony, providing specific examples of [the gang's] commission of robbery and narcotics offenses. We conclude the evidence was sufficient to support the jury's true finding on the section 186.22 gang enhancement . . . ." (*Duran,* at pp. 1465-1466, fn. omitted.)

Defendants assert that, under the rationale of *In re Alexander L.* (2007) 149

Cal.App.4th 605,[14] Moreno's testimony as to the "primary activities" element does not

provide substantial evidence of that element. However, the expert in *Alexander L.* never

testified *what* the primary activities of the subject gang were at the time of the charged

offense (*In re Alexander L., supra,* 149 Cal.App.4th at p. 612) but merely stated he

" '[knew] they've committed quite a few assaults with a deadly weapon . . . . [T]hey've

been involved in murders. [¶] . . . [T]hey've been involved with auto thefts, auto/vehicle

burglaries, felony graffiti, narcotic violations.' " (*Id*. at p. 611.) Moreover, the *Alexander*

*L.* court noted "[n]o specifics were elicited as to the circumstances of these crimes, or

---

14    Defendants also rely on *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1003 to
assert an expert opinion may not be based on hearsay. However, the *Nathaniel C.* court
was concerned with the sufficiency of the evidence offered to establish the second
predicate offense when the *only* testimony presented to prove this part of the "pattern of
criminal gang activity" was by the expert witness, and that witness offered *only*
nonspecific hearsay of a suspected shooting of one family member by another with no
personal knowledge of the incident. The *Nathaniel C.* court concluded "[s]uch vague,
secondhand testimony cannot constitute substantial evidence that the required predicate
offense by a gang member occurred. [Citation.] While experts may offer opinions and
the reasons for their opinions, they may not under the guise of reasons bring before the
trier of fact incompetent hearsay evidence." (*Id*. at p. 1003.) However, Moreno offered
admissible and specific evidence as to both predicate offenses here, rendering *Nathaniel
C.* distinguishable. Moreover, to the extent *Nathaniel C.* stands for the broader
proposition that an expert may not rely on hearsay in forming his or her opinions as to
gang issues, it is inconsistent with *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*),
which concluded that "even matter that is ordinarily *inadmissible* can form the proper
basis for an expert's opinion testimony. [Citations.] And because Evidence Code section
802 allows an expert witness to 'state on direct examination the reasons for his opinion
and the matter . . . upon which it is based,' an expert witness whose opinion is based on
such inadmissible matter can, when testifying, describe the material that forms the basis
of the opinion." (*Id*. at p. 618.) Defendants' broad reading of *Nathaniel C.* appears to be
foreclosed by the contrary holding in *Gardeley*.

20

where, when, or how [the expert] had obtained the information." (*Id.* at pp. 611-612.) Here, in contrast, Moreno unequivocally stated BHB primary activities included several statutorily enumerated offenses, gave specific examples of such crimes by BHB members, testified about his extensive and personal experience with BHB crimes, and cited information about BHB crimes that he obtained from others. Under these circumstances, the defects that may have infected the testimony in *Alexander L.* are not present here (accord, *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330), and Moreno's testimony provided substantial evidence from which the jury could have found the "primary activities" element required to qualify BHB as a gang within the meaning of the STEP act.

D. The Hearsay Challenge to Moreno's Testimony

Defendants next challenge the convictions on count eight (§ 186.22, subd. (a)) and the true findings on the section 186.22, subdivision (b), enhancements by arguing there was evidentiary error. They assert it was error to allow Moreno to testify about inadmissible hearsay on which he relied to form the basis for his opinions as to BHB's primary activities, and inadmissible hearsay on which he relied to form the basis for his opinion that Fredrick and Brooks were BHB members.[15] In addition, Stafford (joined by

---

15 The expert testified Stafford was a member of BHB in August 2010 based, in part, on his admission *directly to* Detective Moreno that Stafford was a member of BHB, and therefore this aspect of the argument does not apply to Stafford. Similarly, the evidence is susceptible to the construction that Moreno's opinion as to Fredrick's membership in BHB was likewise based on Fredrick's admission of BHB membership made *in Moreno's presence*. (See fn. 10, *ante*.) Accordingly, this aspect of the claim appears only

21

Brooks), contends the trial court erred when it overruled his hearsay objection to a specific hearsay statement testified to by Moreno, arguing it was inadmissible, its admission violated his right to confront witnesses, and there was instructional error concerning that evidence.

To establish the statutorily required "primary activities" of the alleged criminal street gang, the prosecution must introduce evidence of either past or present criminal acts listed in subdivision (e) of section 186.22, and evidence supporting the inference those crimes are more than just occasionally committed by the group's members. (*People v. Sengpadychith, supra,* 26 Cal.4th at pp. 323-324.) Our Supreme Court has approved two alternative ways to prove the requisite "primary activities" of the alleged criminal street gang. First, "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Ibid.*) Second, the prosecution can present sufficient evidence through the opinion testimony of a qualified expert, as long as the opinion is based on reliable information. (*Gardeley, supra,* 14 Cal.4th at pp. 618-620.)

In *Gardeley*, the police expert testified the gang of which the defendants were members was primarily engaged in the sale of narcotics and witness intimidation, and based that opinion on conversations he had with the defendants and fellow gang members, and on "his personal investigations of hundreds of crimes committed by gang members," together with information from colleagues in his own police department and

applicable to Brooks, because Moreno's opinion as to Brooks's membership in BHB *was* dependent, in part, on Brooks's admissions to persons other than Moreno.

22

other law enforcement agencies. (*Gardeley*, *supra*, 14 Cal.4th at p. 620.) *Gardeley* concluded the opinion evidence was admissible (*id*. at pp. 617-620) and provided an evidentiary foundation for the jury's findings as to primary activities. (*Id*. at p. 620.) We find no meaningful distinction between the opinions (or the basis for such opinions) approved by the *Gardeley* court and the opinions expressed by Moreno or the evidence on which Moreno relied to form those opinions, and we therefore reject defendants' claim that Moreno's testimony concerning BHB's primary activities was premised on an inadequate foundation or improperly relied on hearsay from other members of law enforcement.[16] (*Gardeley, supra*, 14 Cal.4th at p. 618 ["So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony" including " 'reliable hearsay, including out-of-court declarations of other persons' "]; accord, *People v. Martinez, supra,* 158 Cal.App.4th at p. 1330 [expert had training and experience as gang expert, and his eight years dealing with gang including investigations and personal conversations with members and reviews of reports suffices to establish foundation for testimony on gang's primary activity].)

---

[16] Brooks, arguing that expert testimony should be deemed inadequate to prove the "primary activities" element, cites *U.S. v. Mejia* (2d Cir. 2008) 545 F.3d 179 in which the court questioned whether the use of expert opinion testimony to show a pattern of racketeering activity was permissible under the facts of that case. (*Id*. at pp. 194-196.) However, *Mejia* was decided under Federal Rules of Evidence, rule 702, not the California Evidence Code. (*Mejia,* at pp. 194-196.) Moreover, it is not binding on us. (*People v. Williams* (1997) 16 Cal.4th 153, 190.) Finally, *Meija* does not even mention *Gardeley* and, to the extent it conflicts with *Gardeley,* we are bound by *Gardeley.*

23

Defendants' argument appears to suggest that, even if we conclude Moreno's testimony was proper insofar as he expressed an opinion on BHB's primary activities and insofar as he testified to those matters within his personal knowledge on which his opinion was based, his testimony as to the historical facts (which he learned from others and relied on in forming his opinions) was not admissible, and therefore it was error to allow him to testify about such historical facts. *Gardeley's* analysis forecloses that assertion, because it explained:

> "So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. (*In re Fields* (1990) 51 Cal.3d 1063, 1070 . . . [expert witness can base 'opinion on reliable hearsay, including out-of-court declarations of other persons; citations']. And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' *an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion*." (*Gardeley, supra,* 14 Cal.4th at p. 619, second italics added.)

Because *Gardeley* recognized such testimony may give rise to incipient hearsay issues, it also cautioned that the "trial court . . . 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' " (*Gardeley, supra,* 14 Cal.4th at p. 619.) As the court subsequently explained in *People v. Caitlin* (2001) 26 Cal.4th 81, 137, the expert is permitted to explain the reasons for his or her opinions, including the matters he or she considered in forming them, but " 'prejudice may arise if, " 'under the guise of reasons,' " the expert's detailed explanation " '[brings] before the jury incompetent hearsay evidence.' " ' [Citations.] In this context, the court may ' "exclude from an expert's testimony any hearsay matter

24

whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." ' [Citation.] [¶] Nonetheless, '[b]ecause an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment.' " As the court observed in *People v. Bell* (2007) 40 Cal.4th 582, 608, " '[m]ost often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.]' "

These authorities convince us that an expert is not categorically barred from relating hearsay evidence to the extent it was reliable and relied on by him or her to form his or her opinion, but instead the trial court has discretion to either limit the expert to certain kinds of statements and/or to instruct the jury on the proper use of that evidence. Here, the trial court held an Evidence Code section 402 hearing prior to Moreno's testimony, after which it delimited the types of evidence Moreno could cite as the basis for his opinions. Defendants make no argument on appeal that the trial court's "sound judgment" was abused as to the parameters of Moreno's testimony. Moreover, the court issued the limiting jury instruction described in *People v. Bell, supra,* 40 Cal.4th 582. We conclude there was no error in permitting Moreno to rely on his expertise, and reliable hearsay, to testify on the primary activities of the BHB gang.

We likewise conclude there was no error in permitting Moreno to rely on his expertise, along with all of the other stated bases, to testify that Brooks, Fredrick and Stafford were members of the BHB gang. Of course, because Moreno's opinion as to

25

*Stafford's* membership was based on *Stafford's admissions to Moreno*, Stafford is foreclosed from interposing any claim that Moreno's opinion as to his membership was based on inadmissible hearsay. Moreover, to the extent Moreno's opinion as to as to *Fredrick's* membership in BHB was likewise based on *Fredrick's admission* of BHB membership made *in Moreno's presence* (see fn. 12, *ante*), Fredrick would likewise be foreclosed from interposing any claim that Moreno's opinion as to Fredrick's membership was based on inadmissible hearsay. Finally, as to Brooks, Moreno's opinion as to Brooks's membership in BHB had numerous bases, including Brooks's involvement in the activities of BHB, the fact BHB membership can be obtained through generational connections and Brooks's father and uncle were BHB members, and the fact Moreno was aware Brooks had admitted his membership in BHB to Officers Coughlan, Probost, Forsberg and Albonette. Because a gang expert can form an opinion based on information he or she obtains from other officers (*People v. Williams* (2009) 170 Cal.App.4th 587, 622) as long as it is reliable[17] (*People v. Catlin, supra,* 26 Cal.4th at p. 137), and may relate that information to the jury to explain the basis for the opinion

---

[17]    Brooks does not claim the hearsay related by Officers Coughlan, Probost, Forsberg and Albonette was unreliable. Indeed, because the identities of the men who provided Moreno with the information were disclosed, Brooks had ample opportunity to challenge the reliability of the evidence on which Moreno relied by subpoenaing any of those officers to impeach the information they relayed to Moreno.

(*Gardeley, supra*, 14 Cal.4th at p. 619), Moreno properly relied on and stated that a basis for his opinion as to Brooks's membership was Brooks's admissions to other officers.[18]

Stafford separately argues an additional piece of hearsay was erroneously admitted. Moreno testified (on redirect examination) that he had heard talk about this specific case from people living in the Nickerson Gardens area. When the prosecution asked "what have you heard in that regard?" Moreno responded (after the court overruled Stafford's counsel's hearsay objection): "Just basically, you know, when we have our individuals that we get along with inside the housing developments, we talk to them, ask them about certain individuals . . . and then they would be *'Yeah, yeah, we heard about it. They got arrested over there. Man, those guys really put in some work . . . .'* " (Italics added.) Stafford asserts the admission of these specific statements was error because it was admitted for the truth of the statements and, under the rationale of *People v. Hill* (2011) 191 Cal.App.4th 1104, this type of content-specific hearsay should fall outside the permissible boundaries of admissible hearsay approved by *Gardeley, supra*, 14 Cal.4th 605, and its admission violated his rights under the confrontation clause.[19]

---

[18] We also note that, to the extent Moreno's opinion as to Fredrick's membership in BHB was *not* based on Fredrick's admissions to him, but was instead premised on admissions to officers *other* than Moreno, the same analysis convinces us that his reliance on such information was proper, because Moreno identified the officers (e.g. Officers Coughlin and Wilhelm) to whom Fredrick admitted his membership in BHB.

[19] Stafford also claims the court erroneously gave CALCRIM No. 332. That instruction states: "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that

Even assuming *Hill* was correct in its analysis (but see *People v. Valadez* (2013) 220 Cal.App.4th 16, 29-36), Stafford's argument is not persuasive for a separate reason: the testimony complained of was elicited on redirect examination in response to questions posed by Stafford's counsel's cross-examination of Moreno.  On direct examination, Moreno testified that, in his opinion, a crime committed by members of a Nickerson Gardens gang a distance away from their home base (i.e. Hemet) promoted the gang and assisted further criminal conduct of the gang because it showed the gang is willing to use violence "even outside their territory . . . [¶] . . . [¶] . . . [and] if they could get away with it, most people think, 'Hey, if they could do it, we could do it,' and they are going to follow their lead and continue expanding outside their territory."  On cross-examination, Stafford's counsel (seeking to denigrate that aspect of Moreno's opinion) asked:

> "[Stafford's counsel]: You also said that the benefit to the gang . . . was that other gang members back in Los Angeles would think in their head 'Well, if they could do it, then I could do it too.'  [¶]  Do you remember saying that?
> "[Moreno]: Yes.

opinion.  You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  Stafford claims the penultimate sentence converted hearsay from a matter on which the expert relied into affirmative independent evidence of the content of the hearsay.  Stafford does not suggest CALCRIM No. 332 misstates the law, but only that it could be construed improperly.  Because he did not object that clarification was necessary, nor proffer an alternative instruction, we conclude the claim is forfeited.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "] (*Guiuan*); see also *People v. Bolin* (1998) 18 Cal.4th 297, 328.)  Moreover, even if it were preserved, this argument was rejected by the court in *People v. Felix* (2008) 160 Cal.App.4th 849, 859-860, and we agree with *Felix* that CALCRIM No. 332 properly and adequately states the applicable law.

"[Stafford's counsel]: All right. *In your investigation or your role in this particular case*, *tell me the amount of people that you have talked to that you have heard them say that; that you've had someone say that they heard about this case and* [*said*] *'I can't wait to go out to Hemet and roll . . . Starks.'*
"[Moreno]: It wasn't like that, but *I have heard people talk about the case, but not in that form, the way you are putting it*."

On redirect, the prosecution sought to rebut any adverse inferences this cross-examination sought to achieve (i.e. the crime did not promote the gang because it went unnoticed by the target audience) by showing the crime *did* garner reputational advantages for the gang, asking:

"[Prosecutor]: You said that you have heard since this case came about, you have heard people talk about the case in the Nickerson Gardens area. Did I hear that correctly?
"[Moreno]: Yes, sir.
"[Prosecutor]: What have you heard in that regard?
"[Stafford counsel]: Objection. Hearsay.
"[The Court]: Overruled.
"[Moreno]: Just basically, you know, when we have our individuals that we get along with inside the housing developments, we talk to them, ask then about certain individuals . . . and then they would be 'Yeah, yeah, we heard about it. They got arrested over there. Man, those guys really put in some work,' and this and that and--each conversation is different."
"[The Court]: Ladies and gentlemen, the statements that the officer heard from--allegedly from the residents of the neighborhood are being used to support his opinions and not for the truth of the matter."

When a witness is questioned on cross-examination about matters relevant to the subject of, but not elicited during, direct examination, the witness may be examined on redirect examination on any new matter. (*People v. Steele* (2002) 27 Cal.4th 1230, 1247-1248; *People v. Kynette* (1940) 15 Cal.2d 731, 751-752 (disapproved on other grounds in *People v. Horn* (1974) 12 Cal.3d 290, 301, fn. 8 and in *People v. Snyder* (1958) 50 Cal.2d

29

190, 197.)  A trial court should strive to prevent unfairness to either side when one side presents evidence on a point and then tries to prevent the other side from responding to it. (*Steele,* at pp. 1247-1248 [once defense elicited expert's opinion on cross-examination that killing might have been done in a rage, prosecution entitled to elicit on redirect examination the further opinion it might have also been methodical and also entitled to inquire into facts that might influence this opinion].)  Redirect examination serves two main purposes—to explain or rebut adverse testimony or inferences developed on cross-examination, and to rehabilitate a witness whose credibility has been impeached.  (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)  In *Cleveland*, our Supreme Court ruled that questions asked by the prosecution on redirect examination that elicited evidence the defendant's girlfriend was living elsewhere because of defendant's "drug" business rather than just "some business" was "appropriate" because it supplied the context for the questions posed on cross-examination (*id.* at pp. 745-746), explaining that "[r]edirect examination's 'principal purposes are to explain or rebut adverse testimony or inferences developed on cross-examination, and to rehabilitate a witness whose credibility has been impeached.' "  (*Id.* at p. 746.)  Here, because the prosecution's redirect examination properly fulfilled the function of explaining adverse inferences developed on cross-examination, and the court limited its purpose to providing support for Moreno's opinion, there was no error, constitutional or otherwise, in admitting this evidence.

E. The Bifurcation Claim

Brooks, joined by Stafford and Fredrick , contends the trial court abused its discretion when it denied a motion to bifurcate trial on the section 186.22, subdivision

(a), offense and the section 186.22, subdivision (b), enhancements from trial of the underlying offenses.

*The Motion and Ruling*

Prior to trial, Stafford moved in limine to bifurcate trial on the substantive offenses from trial on the section 186.22, subdivision (b), enhancements appended to those offenses as well as from trial on the section 186.22, subdivision (a), offense. Stafford argued the prejudicial impact of the gang evidence on trial of the underlying counts would outweigh any probative value it might have to the substantive issues in dispute on the underlying counts, and therefore the gang allegations and substantive offense should be bifurcated from the underlying counts. The prosecution asserted the gang allegations should not be bifurcated because the gang evidence would be cross-admissible as to the underlying counts; therefore bifurcation was not warranted under numerous authorities, because it was relevant to show the motive for the crimes, to show the intent of the perpetrators, to show why certain witnesses might testify inconsistently (e.g., affiliation with the gang and/or fear of retribution from the gang), and because it was relevant to reinforce the victim's identification of the perpetrators. The prosecution also asserted that, even were the evidence not cross-admissible, the statutory elements for joinder of the charges were met. Only a clear showing of undue prejudice that outweighed the countervailing considerations of reducing delay in the trial of criminal charges and conservation of judicial resources and public funds would justify denial of bifurcation. (*People v. Hill* (1995) 34 Cal.App.4th 727, 734.) The court denied the motion to bifurcate.

31

*Applicable Legal Framework*

In *People v. Hill, supra,* 34 Cal.App.4th 727, the court explained at pages 734 to 735 that "Penal Code section 954.1, added by Proposition ll5, expressly permits joinder of offenses even when the evidence is not cross-admissible. In light of that statute, the sole question upon review of the denial of a motion for severance is whether the prejudice to the defendant from joinder of the cases outweighed the benefits. [Citation.] [¶] Joinder of criminal charges for trial benefits the public by reducing delay in the disposition of criminal charges, and it benefits the state by conserving judicial resources and public funds. [Fn. omitted.]" In *People v. Hernandez* (2004) 33 Cal.4th 1040 (*Hernandez*), the court recognized that, although a trial court has the same authority to bifurcate a gang enhancement allegation as it has to bifurcate a prior conviction enhancement allegation, a "gang enhancement is different from [a] prior conviction [allegation]. A prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Id*. at p. 1048.) *Hernandez* cautioned it was not stating a court should never bifurcate trial of the gang enhancement from trial of guilt, because the evidence of the charged offenses' gang evidence could be so unduly prejudicial as to warrant bifurcation, but also recognized that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory,

32

membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id.* at pp. 1049-1050.) Moreover, *Hernandez* reaffirmed that:

> "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation. In the context of severing charged offenses, we have explained that 'additional factors favor joinder. Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Quoting *Frank v. Superior Court* (1989) 48 Cal.3d 632, 639.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.] When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.' [Quoting *People v. Bean* (1988) 46 Cal.3d 919, 938-939, fn. omitted.]

> "The analogy between bifurcation and severance is not perfect. Severance of charged offenses is a more inefficient use of judicial resources than bifurcation because severance requires selection of

33

separate juries, and the severed charges would always have to be tried separately; a bifurcated trial is held before the same jury, and the gang enhancement would have to be tried only if the jury found the defendant guilty. But much of what we have said about severance is relevant here, and we conclude that the trial court's discretion to deny bifurcation of a charged gang enhancement is similarly broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Hernandez, supra,* 33 Cal.4th at p. 1050.)

*Evaluation*

We conclude the ruling denying bifurcation was not an abuse of discretion. The People argue, and Brooks concedes, that some of the "gang" evidence *would have been cross-admissible* on the issue of Brooks's and Fredrick's identities as coparticipants with Stafford. Moreover, defendants were charged with conspiracy, which required proof of a specific intent to agree or conspire to commit the target offenses and a specific intent to commit elements of the target offenses (see, e.g., *People v. Morante* (1999) 20 Cal.4th 403, 416), and most or all of the gang evidence would have been cross-admissible to show the relationship of the participants and the likelihood they would have agreed to support each other in committing the target offenses, as required by the conspiracy count. (See *Hernandez, supra*, 33 Cal.4th at p. 1051 [gang evidence relevant to charged offenses because it "served to explain why Hernandez and Fuentes were acting together in the commission of this crime, thus buttressing such guilt issues as motive and intent"].)

Moreover, *Hernandez* makes clear that "[e]ven if some of the expert testimony would not have been admitted at a trial limited to guilt, the countervailing considerations that apply when the enhancement is charged [can permit] a unitary trial." (*Hernandez, supra,* 33 Cal.4th at p. 1051.) Here, although some limited portion of the expert's

34

testimony (e.g. as to predicate crimes) might not have been cross-admissible in a bifurcated proceeding, the same claim was raised in *Hernandez* by a defendant to support his argument that the order denying bifurcation was an abuse of discretion, and was rejected by *Hernandez* when it explained that although such evidence of the predicate crimes "would certainly not have been admissible at a trial limited to the charged offense, . . . that evidence was also not particularly inflammatory. Those convictions were offered to prove the charged gang enhancement, so no problem of confusion with collateral matters would arise, and they were not evidence of offenses for which a defendant might have escaped punishment. Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt. Accordingly, defendants did not meet their burden 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Quoting *People v. Bean, supra,* 46 Cal.3d at p. 938]." (*Hernandez, supra*, 33 Cal.4th at p. 1051.) We conclude, on this evidentiary record, defendants have not demonstrated there was such a substantial danger of undue prejudice from noncross-admissible evidence that it was an abuse of discretion to deny the motion to bifurcate the gang allegations from the underlying offenses.

IV

THE CLAIMS OF INSTRUCTIONAL ERROR

Defendants assert two claims of instructional error. First, Stafford and Brooks assert, because Wilson testified against them at trial, the court was required sua sponte to

35

instruct that the jury must view with caution the testimony of an accomplice. Second, Fredrick, Brooks and Stafford assert the court was required sua sponte to instruct that the section 186.22, subdivision (a), offense requires two or more gang members be involved in the requisite felonious activity but did not do so, and that it exacerbated the instructional lacuna by giving instructions contrary to this principle.

A. <u>The Accomplice Instruction</u>

Stafford and Brooks assert Wilson was an accomplice, because she lured Frank to her apartment (as well as accompanied Fredrick to Shontae's apartment), and her testimony at trial implicated defendants, requiring the court sua sponte to give the cautionary instruction on accomplice testimony.

*Legal Framework*

The law has recognized that testimony by an accomplice can be subject to the taint of improper motives (*Guiuan, supra,* 18 Cal.4th at p. 565) and therefore CALCRIM No. 334 instructs that the jury may not convict on the uncorroborated testimony of an accomplice, and that the testimony of an accomplice should be viewed with caution.[20] The instruction must be "given on the court's own motion . . . when the accomplice witness is called by the People [citations] or when a defendant in testifying implicates his codefendant while confessing his own guilt [citation]." (*People v. Terry* (1970) 2 Cal.3d

---

[20] CALRIM No. 334 instructs that any "testimony of an accomplice that tends to incriminate the defendant should be viewed with caution" and requires corroboration from other evidence, which may be "slight" as long as it tends to connect the defendant to the commission of the crime.

362, 399, overruled on other grounds in *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382.) However, when the accomplice "testifie[s] in her own behalf, not as a prosecution witness, and denie[s] her guilt . . . it was not incumbent to give the accomplice testimony instructions." (*Terry,* at p. 399.) When a defendant-accomplice testifies on his or her own behalf and denies guilt while incriminating a codefendant, " 'it is at most for the discretion of the trial judge whether to give accomplice testimony instructions on his own motion.' " (*People v. Avila* (2006) 38 Cal.4th 491, 562 [quoting *Terry,* at p. 399.) Although *Guiuan* stated a court must instruct the jury sua sponte to view incriminating accomplice testimony with distrust "regardless which party called the accomplice" (*Guiuan, supra*, 18 Cal.4th at p. 569), our Supreme Court later clarified that when the testifying accomplice is a *codefendant,* an accomplice instruction must be given only "when requested by a defendant." (*People v. Box* (2000) 23 Cal.4th 1153, 1209, disapproved on other grounds in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.) "Thus, these cases have not disturbed the long-standing rule that an accomplice instruction need not be given sua sponte when the testifying accomplice is a codefendant." (*People v. Smith* (2005) 135 Cal.App.4th 914, 928.)

Even where there is a sua sponte obligation to instruct on accomplice testimony, the instructional error will be deemed harmless if there is sufficient corroborating evidence, which may be slight, in the record, and will be deemed sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. (*People v. Lewis* (2001) 26 Cal.4th 334, 370; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303.)

*Evaluation*

Here, Wilson was not a witness called by the People, and she did not implicate defendants while confessing her own guilt. Instead, she testified on her own behalf, and claimed innocence by testifying she participated only under duress, thus denying her own guilt of the offenses. Because Wilson "testified in her own behalf, not as a prosecution witness, and denied her guilt, [and hence] it was not incumbent [on the trial court sua sponte] to give the accomplice testimony instructions." (*People v. Terry, supra,* 2 Cal.3d at p. 399.) Although the court still had discretion to give the instruction upon request, no request appears in the record. The absence of the accomplice instructions was not error.[21]

B. The Section 186.22, Subdivision (a), Instruction

Fredrick, joined by Brooks and Stafford, contends the court erred when it did not sua sponte instruct that the section 186.22, subdivision (a), offense requires two or more gang members be involved in the requisite felonious activity and gave instructions contrary to this principle.

_____

[21] Even assuming the instruction should have been given, we would conclude any error was harmless because there was ample corroborating evidence, in the form of the testimonies of Frank and Shontae tying each charged defendant to the commission of the crimes, as well as the fingerprint evidence specifically tying Stafford to the events.

38

*Legal Framework*

A trial court sua sponte must instruct on every element of an offense[22] (*People v. Flood* (1998) 18 Cal.4th 470, 480) and the request "does not depend upon the existence of evidence affirmatively favoring the defendant." (*Id*. at p. 481.) The elements of the section 186.22, subdivision (a), gang participation offense are: active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; with knowledge the gang's members engage in or have engaged in a pattern of criminal gang activity; and the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523.)

In *Rodriguez, supra,* 55 Cal.4th 1125, the court examined "whether the third element is satisfied when a gang member commits a felony while acting alone." (*Id*. at p. 1131.) *Rodriguez* concluded that, "to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit

---

[22]    The trial court's sua sponte instructional obligation applies "whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) Although the People assert the failure to request a modified instruction concerning the elements of the section 186.22, subdivision (a), offense waives any claim of error, our Supreme Court has instructed such a claim may be waived under the doctrine of invited error only when "trial counsel both ' "intentionally caused the trial court to err" ' [quoting *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49] and clearly did so for tactical reasons. Invited error will be found . . . only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*People v. Souza* (2012) 54 Cal.4th 90, 114.) Because the People do not suggest the record contains any expressed tactical purpose by the defense for accepting the instruction given by the trial court, we reject the People's claim of invited error.

felonious criminal conduct. The plain meaning of section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Id.* at p. 1132.) The court concluded that, when the evidence shows the felonious conduct was committed by a single gang member, without the assistance by any other gang member, the evidence would not support a conviction for the section 186.22, subdivision (a), gang participation offense as to that defendant. As a result of *Rodriguez*, decided after the jury returned its verdict here, CALCRIM No. 1400 was modified to instruct that "[a]t least two members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang." (CALCRIM No. 1400 (Spring 2014) p. 1187.)

*Evaluation*

Defendants argue the court erroneously instructed the jury concerning the section 186.22, subdivision (a), gang participation offense because the jury instruction allowed the jury to convict them even if the jury determined that only one (or even none) of them were members of BHB. The trial court instructed the jury on the elements of the section 186.22, subdivision (a), gang participation offense as follows:

> "To prove that a defendant is guilty of this crime, the People must prove that:
> "One. The defendant actively participated in a criminal street gang;
> "Two. When the defendant participated in that gang, he knew that members of the gang engaged in or have engaged in a pattern of criminal activity;
> "And, three. The defendant willfully assisted, furthered, or promoted felonious . . . criminal conduct by members of the gang . . . either by,

40

A, directly and actively committing a felony offense; or, B, aiding and abetting a felony offense.
"Active participation means involvement with a criminal street gang in a way that is more than passive or in name only."
"The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang or that he was an actual gang member."

Defendants argue their respective convictions for the substantive gang participation offense in violation of section 186.22, subdivision (a), must be reversed because the instruction was silent on any requirement for the jury to determine that at least two of them were BHB gang members acting together in committing the offenses, and such instructional lacuna (as exacerbated by other instructions suggesting only one gang member need be involved in the underlying offenses to trigger liability under § 186.22, subd. (a)) cannot be deemed harmless error in this case. Certainly, *Rodriguez* held the substantive gang offense under section 186.22, subdivision (a), requires the participation of at least two members of the same gang in the felonious conduct, but the instruction given here stated the prosecution "[did] *not* have to prove that the defendant . . . was an *actual* gang member" (italics added), and did not contain any mention that the prosecution *did* have to prove (and the jury did have to find) that at least two of the three defendants *were* gang members. Moreover, that silence was complicated by the instruction that the requisite "willful assistance" element could be satisfied if the defendant aided and abetted a felony offense and went on to instruct that the aiding and abetting element was satisfied if the prosecution proved "[*a*] member" of the gang committed the crime, the defendant knew "*the* gang member" intended to commit the crime, the defendant intended to aid and abet "*the* gang member" in committing the

41

crime, and the defendant's words or conduct did in fact aid and abet the commission of the crime. To the extent this instruction arguably required the jury to find "a" member of the group was a gang member, it simultaneously only required that "a" member of the group to be a gang member rather than, as *Rodriguez* holds, that at least two members of the group be gang members.

The People argue the evidence was sufficient because Moreno testified each defendant was a member of BHB, and therefore more than one gang member was involved in the felonious conduct. Although this testimony could have provided substantial evidence for the jury's conviction *if* the jury had been instructed on the necessity of finding felonious criminal participation by more than one gang member, the jury was not so instructed and we therefore question whether the jury ever, in fact, made the required finding in light of *Rodriguez's* holding that the third element is not satisfied when a gang member commits a felony while acting without other gang members. As *Rodriguez* reasoned, the word " 'members' is a plural noun" (*Rodriguez, supra*, 55 Cal.4th at p. 1132), and "[t]herefore, to satisfy the third element, a defendant must willfully advance, encourage, contribute to, or help *members* of his gang commit felonious criminal conduct. The plain meaning of section 186.22[, subdivision] (a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member." (*Ibid*.) By interpreting section 186.22, subdivision (a) to require that one of the people who engaged in the felonious conduct (in addition to defendant) belonged to the same gang as the defendant (*id*. at p. 1131), which this court in *People v. Velasco* (2015) 235 Cal.App.4th 66, 78 construed

42

as not being satisfied if only *one* of the coparticipants in the crime belonged to the gang, a jury could convict the defendants of the section 186.22, subdivision (a), offense *only* if it found at least two of the three attackers were fellow gang members.

This jury was not given the instruction, created post-*Rodriguez*, that "[a]t least two gang members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang."  Because the jury was instructed before *Rodriguez* was decided, this language was not included in its instruction, and we therefore cannot presume the jury found the necessary participation by two or more gang members, which leads us to conclude defendants were denied their due process right to have the jury determine each fact necessary to the conviction beyond a reasonable doubt.  (*In re Winship* (1970) 397 U.S. 358, 364.)  We do not conclude the instructional omission was harmless.  Although the evidence as to Stafford's BHB membership was strong, composed as it was of evidence of his *admission* to such membership *apart* from Moreno's opinion of Stafford's membership, the evidence as to the other defendants was limited to Moreno's *opinion* they were members of BHB, and there was conflicting evidence to undermine that opinion: they did not wear gang attire; they did not commit the crime while making statements indicative of BHB affiliation; and the crime was committed outside BHB territory and for an arguably personal, rather than gang, motive (e.g. Stafford's relationship with Wilson, with whom Frank was involved).  Considering the absence of instruction on the concept clarified in *Rodriguez*, we do not conclude beyond a reasonable doubt that the jury actually deliberated on this factual issue, or

43

conclude beyond a reasonable doubt that a properly instructed jury would have found the requisite elements beyond a reasonable doubt. We conclude the convictions on the section 186.22, subdivision (a), offenses must be reversed.[23]

V

THE *FARETTA*[24] CLAIM

Fredrick separately contends the court lacked discretion to deny his timely motion to represent himself. Fredrick also asserts that, because his motion was timely, the court erred by coercing him to forgo his right to represent himself in posttrial proceedings by misinforming him that, although he could seek to represent himself, sentencing and other posttrial proceedings would remain on schedule even if he discharged his counsel and undertook to represent himself.

A. Factual Background

The jury returned their verdicts in October 2012 and sentencing was scheduled for January 11, 2013. However, on that date, the defense sought and obtained a continuance of sentencing to March 8, 2013. At the March 8 hearing, the defense again sought a continuance and the court granted the continuance until May 23, 2013. However, the court's order granting the continuance specified that no attorney "be engaged in any other matter that will be in conflict with this case going forward on 5/23/13."

---

[23] We note that at least one court has recently reached a similar conclusion. (See *People v. Vega* (2015) 236 Cal.App.4th 484, 503-506.)

[24] *Faretta v. California* (1975) 422 U.S. 806.

44

At the May 23, 2013, sentencing hearing, Fredrick indicated for the first time that he wished to represent himself and to file in propria persona his own motion for a new trial. However, Fredrick had not informed his attorney of his wish until that morning and therefore had not yet filled out the written "*Faretta* waiver" form. The court told Fredrick to fill out the form and discuss it with his attorney, and the court would consider his *Faretta* motion and his request to continue the sentencing hearing, but cautioned him that the court was "not too sympathetic" toward his motion to continue the sentencing hearing.

The court then turned to Brooks's request for additional time to file a new trial motion based on his counsel's inability to obtain a statement from Wilson in support of the new trial motion. The court noted that, despite its prior order, Brooks's counsel was not present and Brooks stated he did not want to proceed to sentencing without his counsel. However, because the court was concerned that Brooks was not waiving his right to be represented at sentencing by the same counsel who represented him at trial, the court indicated it would take a recess to determine a date after May 31, 2013, when sentencing could proceed.

Following the recess, the court first stated that it was "regrettably" required to continue the sentencing hearing for two weeks, and obtained waivers from both Brooks and Stafford to permit sentencing to be continued until June 7, 2013. The court then turned to Fredrick's *Faretta* motion and asked whether Fredrick understood that, if he undertook to represent himself, there would be no further continuances and that sentencing would proceed on June 7, 2013. Fredrick indicated that, if the court was not

45

going to grant him a continuance, he did not wish to represent himself. The court then found, under *People v. Windham* (1977) 19 Cal.3d 121, that Fredrick's attorney had provided him with the "highest quality" of representation and had been representing him since before trial; and that Fredrick's request to represent himself and for a continuance was to allow him more time to investigate a new trial motion, which was very late in the proceedings; and that granting the *Faretta* motion would necessitate a significant continuance to allow Fredrick to investigate and prepare a new trial motion. The court noted that, because Fredrick indicated he was not ready to proceed as a self-represented litigant and would not receive a continuance, Fredrick was withdrawing his *Faretta* motion.

B. Legal Standards

The United States Supreme Court in *Faretta* held a defendant in a state criminal trial has a federal constitutional right to represent him- or herself without counsel if he or she voluntarily and intelligently elects to do so. (*Faretta v. California, supra*, 422 U.S. 806.) However, that right is not absolute (*Indiana v. Edwards* (2008) 554 U.S. 164, 171), and a request for self-representation must be both unequivocal and timely. (*People v. Valdez* (2004) 32 Cal.4th 73, 97-98.)

Addressing the timeliness issue, the court in (*People v. Miller* (2007) 153 Cal.App.4th 1015 (*Miller*)) explained that "once a defendant has chosen to proceed to trial represented by counsel, the decision whether to permit the defendant to discharge his attorney and represent himself is left to the trial court's sound discretion. [Citing *People v. Windham, supra*, 19 Cal.3d at p. 128.) 'When such a midtrial request for self-

46

representation is presented the trial court shall inquire *sua sponte* into the specific factors underlying the request . . . . Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' (*Ibid.*)"  (*Id.* at p. 1022.)

In *Miller*, the court noted "[t]he timeliness of a *Faretta* motion made after a finding of guilt but before sentencing appears to be a question of first impression." (*Miller, supra,* 153 Cal.App.4th at p. 1022.)  *Miller*, after noting that "whether a trial court must grant a request for self-representation as a matter of right or whether it has discretion to grant the motion turns on whether the request is made during trial . . . [concluded that a] request for self-representation, made after the jury returned its verdict and his new trial motion had been denied, but well before sentencing, was not made during trial for the simple reason that sentencing occurs posttrial . . . [citations] . . . [and] sentencing is a proceeding separate and distinct from the trial."  (*Id.* at pp. 1023-1024.) *Miller* concluded a request for self-representation made more than two months before the sentencing hearing, and after the defendant assured the court he would be prepared at the new sentencing date, was a timely assertion of his absolute right to self-representation at the new hearing, reasoning that "[t]he concern that led to the conclusion that motions for self-representation made during trial are subject to the trial court's discretion, namely the potential disruption of proceedings already in progress, simply does not apply to

47

sentencing hearings . . . ." (*Id*. at p. 1024.) However, *Miller* cautioned, "[t]his is not to say that every request for self-representation at sentencing will be timely. Much as a request to represent oneself at trial must be made a reasonable time before trial commences, the request for self-representation at sentencing must be made within a reasonable time prior to commencement of the sentencing hearing." (*Ibid*.)

C. Evaluation

Fredrick first claims that, because he timely moved to represent himself during sentencing, the court should have granted the motion rather than applying the discretionary factors described in *Windham*. We conclude the trial court correctly determined that application of *Windham's* discretionary approach to evaluating Fredrick's *Faretta* motion, rather than *Miller's* "absolute" right to self-representation at a sentencing hearing, was the proper approach. First, the motion in *Miller* was made two months before the scheduled sentencing hearing (*Miller, supra*, 153 Cal.App.4th at p. 1024) and would have involved no delay in the scheduled sentencing hearing; here, it was made on the day of the sentencing hearing and would likely have further delayed a sentencing hearing already twice continued. *Faretta* motions made at the commencement of trial are not deemed sufficiently timely to trigger the absolute right to self-representation but are instead vested in the trial court's discretion to determine whether to grant the motion under the *Windham* approach (*People v. Clark* (1992) 3 Cal.4th 41, 99-100, disapproved on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462; *Miller,* at p. 1022), and therefore the court was entitled to consider the " 'disruption or delay which might reasonably be expected to follow the granting of such a motion.' " (*Miller,* at p. 1022.)

48

Second, in *Miller,* the defendant sought to represent himself so he could do his own legal research to "to see if anything could help him *at sentencing.*" (*Miller,* at p. 1020, italics added.)  Here, in contrast, Fredrick's *Faretta* motion expressed no interest in the issues surrounding the sentencing proceeding, but instead suggested he wanted to represent himself so that he could file a motion for a new trial, which undoubtedly would have required delay in the sentencing proceedings.  Thus, whereas the *Miller* defendant actually wanted to represent himself in the *new* proceeding (the sentencing hearing), Fredrick wanted to represent himself in a matter collateral to the sentencing hearing (the new trial motion), which was, in effect, a continuation of the trial itself.  Under such circumstances, we conclude the trial court correctly applied the *Windham* approach in considering whether to exercise its discretion to grant the *Faretta* motion.

Fredrick also asserts the court erred when it misinformed him that, even if he undertook to represent himself for the remainder of the proceedings, there would be no additional continuances, and this misinformation coerced Fredrick into forgoing his right to represent himself.  This argument fails, however, because our Supreme Court has held that, in the face of an untimely request, the grant of propria persona status may be conditioned on the defendant's ability to proceed with the trial without a continuance. (See, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1039.)  Although Fredrick is correct that a necessary continuance should be granted *if* a motion for self-representation is granted (*People v. Clark, supra,* 3 Cal.4th at p. 110), our Supreme Court has explained that " 'it also is established that a midtrial *Faretta* motion may be denied on the ground that delay or a continuance would be required,' [quoting *Clark,* at p. 110] and sanctioned

49

the trial court's decision to condition the granting of the right of self-representation on defendant's waiver of a continuance." (*People v. Jenkins, supra,* 22 Cal.4th at p. 1039.) Because the trial court was entitled to deny Fredrick's untimely motion outright, or to condition its grant of the motion on Fredrick's waiver of any additional continuances, there was no error when it advised Fredrick that he would be required to proceed with sentencing without further continuances even if he were to undertake self-representation.

VI

THE REMAINING CHALLENGES TO THE SENTENCES[25]

The parties dispute the propriety of two aspects of the sentences imposed on Fredrick, Brooks and Stafford.[26] First, Fredrick, Stafford and Brooks assert that because the torture count (§ 206, count 2) on which defendants were sentenced was based on the same act and had the same intent as the robbery count, the sentence on the torture count

---

[25] Defendants' opening briefs raised other challenges to the sentences insofar as they were convicted of and sentenced for the section 186.22, subdivision (a), gang participation offense. They contended the section 186.22, subdivision (a), gang participation offense was a "necessarily included" offense to the crimes they were convicted of in counts one, two and three by virtue of the section 186.22, subdivision (b), enhancements to those counts, which therefore required reversal of the section 186.22, subdivision (a), gang participation offense; and any sentence on the section 186.22, subdivision (a), gang participation offense had to be stayed under section 654 in light of the sentence enhancements imposed pursuant to the section 186.22, subdivision (b), enhancements appended to those counts. Because of our conclusion that the section 186.22, subdivision (a), gang participation offense must be reversed based on instructional error (see part IV, *ante*), these claims are moot.

[26] Brooks also asserts the sentence on the conspiracy count (§ 182, subd. (a)(1), count 1) should have been stayed under section 654. The People concede, and we agree, that the sentence on the conspiracy count (§ 182, subd. (a)(1), count 1) should have been stayed under section 654.

50

should have been stayed pursuant to section 654.  Second, Fredrick and Brooks, joined by Stafford, assert the court erred when it imposed an unstayed three-year term for the great bodily injury enhancement (the GBI enhancement) under section 12022.7, appended to the robbery count, because great bodily injury is an element of the torture count (§ 206, count 2) on which defendants were sentenced, and therefore the sentence on the GBI enhancement should have been stayed pursuant to section 654.

A. Legal Framework

Section 654, subdivision (a), as relevant here, provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Our Supreme Court has explained "[t]he test for determining whether section 654 prohibits multiple punishment has long been established: 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. . . .'  [Citation.]"  (*People v. Britt* (2004) 32 Cal.4th 944, 951-952.)  "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating[,] one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.  [Citation.]  [¶]  If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations

shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

A trial court's express or implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if supported by substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Racy* (2007) 148 Cal.App.4th 1327, 1336-1337.)

B. Substantial Evidence Supports Unstayed Terms for Both the Robbery and Torture Convictions

Defendants contend the evidence showed their principal intent and objective was to rob Frank of the large stash of money they believed he possessed, and because they used torture to extract from Frank the location of that stash, the torture was merely incidental to (or was the means of accomplishing or facilitating) the objective of robbing him, and therefore section 654 precluded punishing them for both offenses. The trial court, when it considered and imposed the sentence, rejected their argument, stating: "I did consider whether or not all of the crimes were 654 or should be 654 arising out of the same incidents. With that, I did 654 some of the crimes believing they were arising out of the same set of facts and incidences, and other crimes I did not, finding that the defendants committed additional crimes that were not required in order to commit the underlying offense." In imposing the sentence for torture, the court found "the residential robbery could have been completed without the torture aspect. The Court finds that the torturing of the victim in this case went above and beyond what was required to commit the robbery . . . ."

52

There is substantial evidence to support the finding defendants had multiple objectives here.  A trier of fact could conclude the intent behind the robbery was to deprive Frank of his property, and was amply demonstrated when they struck Frank, bound him up, and ultimately took the property from his person.  There was also some evidence defendants had a different intent when they markedly escalated the violence against him by torturing him: as retribution for his lack of cooperation in revealing the locale of his larger stash, or to instill fear to deter Frank from cooperating with police, or even as punishment for his transgression of romancing Stafford's "bitch."  When a defendant harbors multiple criminal objectives, "which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' "  (*People v. Harrison, supra,* 48 Cal.3d at p. 335.)  In *Harrison,* the court allowed separate and consecutive punishment, based on defendant's intent, in a multiple count sexual assault in which each offense occurred over a period of seven to 10 minutes, stating "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible."  (*Ibid.*)  Thus, in *People v. Trotter* (1992) 7 Cal.App.4th 363, only one minute separated two gunshots fired at a pursuing police officer.  The court concluded consecutive punishment for each shot was proper, noting the defendant's conduct "became more egregious with each successive shot.  Each shot posed a separate and distinct risk to [the victim] and nearby freeway drivers.  To find section 654 applicable to these facts would violate the very purpose for the statute's existence."  (*Id.*

53

at p. 368; accord, *People v. Surdi* (1995) 35 Cal.App.4th 685, 688-689.) Additionally, the *Trotter* court observed that "this was not a case where only one volitional act gave rise to multiple offenses. Each shot required a separate trigger pull. All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable." (*Trotter,* at p. 368.) *Trotter* is persuasive here. As the trial court noted, the decision to use torture to secure additional money was an escalation of defendants' larcenous intent, was an act that required calculation above that required for the robbery, was separated by some modicum of time, and was not a necessary adjunct in their original goal. We conclude that, at least within the meaning of section 654, there is substantial evidence to support the finding defendants had a separate intent and objective other than robbery when they tortured Frank.

C. Section 654 Requires the GBI Enhancement Be Stayed as to Brooks

The information alleged, and the jury found true, that each defendant personally inflicted great bodily injury on Frank in connection with the robbery. (§§ 12022.7, subd. (a)(1) & 1192.7, subd. (c)(8).) The jury also convicted each defendant of torture, an element of which crime was the requirement that the victim suffered great bodily injury. (*People v. Lewis* (2004) 120 Cal.App.4th 882, 887-888 [elements of torture are infliction of great bodily injury as defined in section 12022.7 and specific intent to cause cruel or extreme pain and suffering].) The court imposed an unstayed three-year term on each

54

defendant for the section 12022.7 enhancement appended to the robbery count, and defendants assert on appeal this was error.[27]

Defendants argue, and the People do not dispute, that section 654 applies to enhancements that go to the nature of the offense and can bar multiple punishment for the same aspect of a criminal act (*People v. Ahmed* (2011) 53 Cal.4th 156, 163-164), and where great bodily injury to a victim is an aspect of a count on which an unstayed sentence has been imposed, section 654 can bar imposition of an unstayed GBI enhancement appended to a different count involving that same victim. (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1218-1220.) Defendants argue that, because great bodily injury to Frank was an element of the torture count on which unstayed sentences were imposed, section 654 barred imposition of an unstayed sentence for the GBI enhancement

---

[27] No defendant suggested below that section 654 should bar imposition on an unstayed three-year term, and therefore the record is silent on why the trial court found section 654 did not apply. Ordinarily, the failure to object to sentencing choices within the range of authorized sentences would forfeit a claim of error. (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Because the application of section 654 appears to turn on the intent and objective of the actor (see, e.g., *People v. Britt, supra,* 32 Cal.4th at pp. 951-952) and *would* authorize separate punishments for each statutory violation committed in pursuit of separate objectives " 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct' " (*People v. Harrison, supra,* 48 Cal.3d at p. 335), we would decide (if this were a matter of first impression) that the sentence was not "unauthorized" (i.e. "could not lawfully be imposed under any circumstance in the particular case" within the meaning of *People v. Scott, supra,* 9 Cal.4th at p. 354) and any objection would be waived if not raised below. However, *Scott* has pronounced the rule to be to the contrary (*id.* at p. 354, fn. 17 [a "court acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654"]), and we are bound by that pronouncement. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction"].)

appended to the robbery count as to that same victim. The People counter that the blows underlying the GBI enhancement differed from the great bodily injury aspect of the torture count. The People argue the blows underlying the GBI enhancement were, as to Fredrick, when Fredrick struck Frank in the back of Frank's head with a pistol (a wound that required staples to close) and, as to Stafford, when Stafford used another pistol to strike Frank in the face near Frank's eye (which caused swelling for about a week and one-half and redness in the white of his eye for about a month). In contrast, the People assert the torture count was premised on Stafford's and Brooks's applying heated utensils to Frank's forearms. Accordingly, the People assert the great bodily injury *aspect* of the torture count (the heated utensils) was different from the assaultive act forming the basis for the GBI enhancement appended to the robbery count.

We agree with the People that there is some evidence from which the court, as trier of fact for purposes of applying section 654, could have found that the great bodily injury *aspect* of the torture count (the injuries caused by the heated utensils) was different from the assaultive acts (Stafford's and Fredrick's blows to Frank's head with the weapons) forming the basis for the GBI enhancement appended to the robbery count. Accordingly, section 654 did not require the court to stay imposition of the GBI enhancement merely because it also imposed an unstayed sentence for torture on Stafford (as the direct perpetrator of the injury with the heated utensil) and on Fredrick (as an aider and abettor of Stafford's and Brooks's causing great bodily injury with the heated utensils). Fredrick and Stafford assert, however, that "where there *is* a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in

56

applying section 654" (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339, italics added) and argue the prosecution's closing argument, by citing both the blow to the head by Fredrick and the heated utensils by Stafford and Brooks as forming the basis for the great bodily injury element of the torture count as well as for the GBI enhancement, shows there was a specific factual basis for the verdict that constrained the trial court's application of section 654. However, the *McCoy* court's reference to the constraints imposed on a trial court's discretion under section 654 relied on *People v. Siko* (1988) 45 Cal.3d 820, in which both the charging instrument and the verdict itself had specified the lewd conduct conviction was predicated on two specific sex offenses of which the defendant was convicted, and that convinced the *Siko* court the prosecution would not be allowed to posit an alternative factual basis (based on the evidence at trial) for two generic molestation convictions other than the two specific sex acts for which the jury had also convicted the defendant, and therefore held section 654 precluded punishment for the generic offenses as well. (*Siko*, *supra*, at pp. 825-826.) Because no analogous specification is present here, neither *McCoy* nor *Siko* support Fredrick's and Stafford's argument. (Accord, *People v. Centers* (1999) 73 Cal.App.4th 84, 100-101 [neither the information nor the verdicts specified a particular victim of the burglary and its firearm enhancement and therefore court could make factual finding on that issue for purposes of applying section 654.].)

Our conclusion as to Brooks, however, is that section 654 does bar imposition of both a sentence on the torture count and an unstayed sentence on the section 12022.7 enhancement. The GBI enhancement appended to the robbery count required a finding

57

that Brooks *personally* inflicted the great bodily injury to Frank (*People v. Cole* (1982) 31 Cal.3d 568, 572 [§ 12022.7 applies only to those who personally inflict the injury and "necessarily excludes those who may have aided or abetted the actor directly inflicting the injury"], 572-573), and the People concede the only great bodily injury *personally* inflicted by Brooks on Frank was the same great bodily injury—the injuries caused by the heated utensils—that was the requisite great bodily injury aspect of the torture count. Under these circumstances, section 654 applies to preclude imposition on Brooks of both a sentence on the torture count and an unstayed sentence on the section 12022.7 enhancement.

## DISPOSITION

The judgment of conviction on the section 186.22, subdivision (a), offense, as alleged in count eight, is reversed as to all defendants. The term imposed on Brooks for the conspiracy conviction, as alleged in count one, and the term imposed on Brooks for the true finding on the section 12022.7 enhancement appended to count three, shall be stayed pursuant to section 654. On remand, the court shall amend the abstract of judgment to reflect these changes. In all other respects, the judgments are affirmed.


McDONALD, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.

58